Filing # 206838689 E-Filed 09/13/2024 01:02:02 PM

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR MARTIN COUNTY, FLORIDA**

ROBERT STANFIELD                                     CASE NO.:

      Plaintiff.

v.

3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co.,
TYCO FIRE PRODUCTS, L.P., CHEMGUARD, INC.,
BUCKEYE FIRE EQUIPMENT COMPANY, NATIONAL FOAM, INC.,
KIDDE-FENWAL, INC., DYNAX CORPORATION,
E.I. DU PONT DE NEMOURS and COMPANY,
THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC.,
CORTEVA, INC., DUPONT DE NEMOURS, INC.,
BASF CORPORATION, individually and as successor in interest to Ciba, Inc.,
CLARIANT CORPORATION, individually and
as successor in interest to Sandoz Chemical Corporation
and MARTIN COUNTY UTILITIES.

      Defendants.

_____/

      The Plaintiff, Robert Stanfield, by and through his undersigned counsel, brings these complaints against Defendants 3M Company, f/k/a Minnesota Mining and Manufacturing Co., Tyco Fire Products, L.P., Chemguard, Inc., Buckeye Fire Equipment Company, National Foam, Inc., Kidde-Fenwal, Inc., Dynax Corporation, E.I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company FC, L.L.C., Corteva, Inc., DuPont de Nemours, Inc., BASF Corporation, and Clariant Corporation (collectively the "Corporate Defendants") and Martin County Utilities, and alleges as follows:

**INTRODUCTION**

1.      The Plaintiff was a healthy man, approaching his golden years, when he was suddenly diagnosed with cancer. He had no prior symptoms of cancer. He lived a healthy lifestyle. His initial tests could not reveal the cause of his cancer. Once he had his blood tested for "PFAS", the answer was clear. The Plaintiff developed cancer due to drinking the water provided by the City of Stuart Water System and Martin County Utilities that contained unhealthy amounts of PFAS compounds manufactured, marketed, and sold by the Corporate Defendants to the City of Stuart Fire Department and other local customers that foreseeably leeched into and contaminated the water supply.

2.      PFAS refers to products containing per-fluoroalkyl and poly-fluoroalkyl substances, including perfluorooctanoic acid ("PFOA"). PFOA's attribute is that when applied to surfaces or used with other products, it will repel water, grease, and oil. These compounds are not found in nature and are man-made chemical compounds. PFOA is a fluorosurfactant and it was a component of AFFF (Aqueous Film-Forming Foam) products. AFFF is used as a fire suppressant used to fight fires involving petroleum and other flammable liquids.

3.      Some of the factors that make PFOA and PFAS dangerous are that they are mobile, do not degrade, and remain in the environment. They also bioaccumulate, meaning they accumulate in humans and other living creatures. In addition, they biomagnify, meaning that they remain and accumulate further as you move up the food chain. Most significantly, however, when they are in the water supply and are absorbed into the human body, they are toxic. PFOA and PFAS have been linked to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, infertility, and other cancers and diseases, including the diseases that are taking the life of the Plaintiff.

4.      As detailed further in this Complaint, AFFF has been used in fire suppression since the 1960's. The Corporate Defendants herein designed, manufactured, marketed, distributed, and/or sold AFFF after acquiring the knowledge that PFAS were toxic and that using their products as intended would release these poisons into the environment where they persist without breaking down or becoming inert.

2

5.    The Corporate Defendants distributed, marketed, and/or sold AFFF products to the military, fire training facilities, fire departments, and airports, including areas from which the City of Stuart and Martin County Utilities drew groundwater into the water system.

6.    The City of Stuart and Martin County Utilities supplied the water that Plaintiff drank while at work. The water was contaminated with unsafe levels of PFAS, PFOA, PFOS and related compounds.

7.    Upon information and belief, and at times relevant to this matter, the City of Stuart Fire Department used property located near the Plaintiff's place of employment as a training and testing facility and used copious amounts of AFFF products at that location and allowing the toxic products to seep into the ground.

## PARTIES

8.    The Plaintiff, Robert Stanfield, is an individual, a resident of St. Lucie County, Florida, over the age of majority and otherwise sui juris. At all times relevant to this matter, he was employed by American Custom Yachts, now known as Willis Custom Yachts, located at 6800 SW Jack James Drive, in Stuart, Florida. At all times material to this matter, Plaintiff ingested copious amounts of drinking water supplied by the City of Stuart and Martin County Utilities contaminated with carcinogenic substances known as "Forever chemicals" produced, manufactured, sold, provided and otherwise introduced to the water system by the other defendants. The Plaintiff now has stage 4 cancer and has only months to live.

9.    Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota, 55144. 3M conducts business and sells its products throughout the United States, including Florida.

10.    At all times material to this matter, Defendant 3M manufactured, distributed, sold, marketed, and produced products containing PFAS, which includes, among other substances, PFOA and/or PFOS, inherently dangerous substances, throughout the country and specifically in Martin County Florida and the City of Stuart. 3M's products containing

3

PFAS and/or related substances were used by the City of Stuart and its Fire Rescue Department.

11.    Defendant Tyco Fire Products, L.P. ("Tyco") is a limited partnership organized and created under Delaware law, having its principal place of business in One Stanton Street, Marinette, Wisconsin.

12.    At all times material to this matter, Tyco created, distributed, sold, marketed and produced its products through interstate commerce throughout the United States, including Florida. Tyco is the successor in interest to the Ansul Company ("Ansul") and manufactured a brand of products under the Ansul brand that included fire suppressant products, including AFFF containing fluorocarbon surfactants containing PFAS.

13.    Ansul designed, manufactured, distributed, and sold AFFF products throughout the country including Martin County, Florida, containing PFAS including PFOA and PFOS from around 1975 through the acquisition of Ansul by Tyco in 1990. Tyco/Ansul continued the manufacturing, selling, and distributing of its AFFF products containing PFAS including PFOA and PFOS.

14.    Defendant Chemguard Inc. ("Chemguard") is a corporation organized under the laws of Texas, with its principal place of business at One Stanton Street, Marinette, Wisconsin, 54143.

15.    At all times material to this matter, Chemguard created, designed, distributed, manufactured, and sold AFFF products through interstate commerce, containing PFAS and/or PFAS-related toxicants in AFFF. Chemguard does business throughout the United States, including conducting business in Florida.

16.    Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized under the laws of Ohio, having its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. Buckeye does business throughout the United States including conducting business in Florida.

17.    At all times material to this matter, Buckeye Fire created, designed, manufactured, distributed, marketed, sold and promoted AFFF products through interstate commerce, containing PFOA, PFOS and other toxic substances.

4

18.     Defendant National Foam, Inc, (a/k/a/ Chubb National Foam) ("National Foam") is a corporation organized under the laws of Delaware and has its principal place of business at 141 Junny Road, Angier, North Carolina, 27501.

19.     National Foam is the successor in interest to Angus Fire Armor Company which manufactures "Angus "and "Angus Fire" branded products. National Foam does business throughout the United States including conducting business in Florida. National Foam created, manufactured, distributed, marketed, and sold fire suppression products which included AFFF containing fluorocarbon surfactants containing PFAS and/or PFAS related toxic substances.

20.     Defendant Kidde-Fenwal, Inc ("Kidde") is a corporation organized under the laws of Delaware with its principal place of business at One Financial Plaza, Hartford, Connecticut, 06101.

21.     Kidde is the successor in interest to Kidde Fire Fighting, Inc. (f/k/a/ Chubb National Foam, Inc., f/k/a National Foam System, Inc.), Kidde does business throughout the United States including conducting business in Florida. Kidde created, designed, marketed, manufactured, and/or sold AFFF products containing PFAS and/or PFAS-related toxic substances. Upon information and belief, Kidde-Fenwal, Inc., has filed for bankruptcy.

22.     Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of Delaware with its principal place of business at 103 Fairview Park Drive, Elmsford, New York, 10523.

23.     Dynax does business throughout the United States including conducting business in Florida. Dynax created, manufactured, distributed, and/or sold AFFF products containing PFAS and/or PFAS-related toxic substances, including firefighting foam agents containing fluorosurfactants and fluorochemical foam stabilizers.

24.     Dynax's products containing fluorosurfactants and fluorochemical foam stabilizers were used in its AFFF products manufactured by National Foam. National Foam's AFFF products were used by the Stuart Fire Rescue and infiltrated the water supply distributed and sold by Martin County Utilities.

25.     Defendant E.I. du Pont De Nemours & Co. is a corporation organized under the laws of Delaware with its principal place of business at 974 Centre Road, Wilmington, DE, 19805. E.I. du Pont De Nemours & Co. does business throughout the United States including conducting business in Florida. E.I. du Pont De Nemours & Co., designed, manufactured, distributed, and/or sold AFFF products containing PFAS and/or PFAS related toxic substances.

26.     Defendant The Chemours Company is a corporation organized under the laws of Delaware with its principal place of business at 1007 Market Street, Wilmington, DE, 19899. The Chemours Company does business throughout the United States including conducting business in Florida. The Chemours Company created, designed, manufactured, distributed, and/or sold AFFF products that contained PFAS and/or PFAS related toxic substances.

27.     The Chemours Company was incorporated on April 30, 2015, as a wholly owned subsidiary of Defendant E.I. du Pont De Nemours & Co. In July 2015, E.I. du Pont De Nemours & Co., "spun-off" The Chemours Company into an independent publicly traded company. E.I. du Pont De Nemours & Co. transferred du Pont's performance chemical business which included its AFFF and fluoroproduct business.

28.     The Defendant Chemours Company FC, LLC is a corporation organized under the laws of Delaware with its principal place of business at 1007 Market Street, Wilmington, DE, 19899. Chemours Company FC does business throughout the United States including conducting business in Florida. The Chemours Company FC created, designed, manufactured, distributed and/or sold AFFF products containing PFAS and/or PFAS related toxic substances.

29.     The Chemours Company and The Chemours Company FC are collectively referred to as "Chemours" throughout this Complaint.

30.     In August 2017, E.I. DuPont De Nemours & Co. merged with The Dow Chemical Company and became DowDuPont, Inc. ("DowDuPont"). Since that time, E.I. DuPont De Nemours & Co. and the Dow Chemical Company have become subsidiaries of

DowDuPont. DowDuPont has separated its agriculture, materials, science and specialty products businesses into three separate publicly traded entities.

31.     The Defendant Corteva, Inc. ("Corteva") is a corporation formed under the laws of Delaware with its principal place of business at 974 Centre Road, Wilmington, DE., and does business throughout the United States including conducting business in Florida. Corteva created, designed, manufactured, distributed and/or sold AFFF products that contained PFAS and/or PFAS related toxic substances.

32.     Corteva was formed in February 2018 and was a wholly owned subsidiary of DowDuPont until June 1, 2019. On that date a stock dividend issuing all Corteva common stock to DowDuPont stockholders resulted in Corteva being the direct parent of E.I. DuPont De Nemours & Co. and holds DowDuPont's assets and liabilities including DowDuPont's agriculture and nutritional businesses.

33.     Defendant, DuPont de Nemours, Inc. (f/k/a/ DowDupont Inc.), is a corporation formed under the laws of Delaware with its principal place of business at 974 Centre Road, Wilmington, DE 19805 and does business throughout the United States including conducting business in Florida. DuPont de Nemours created, designed, manufactured, distributed and/or sold AFFF products containing PFAS and/or PFAS related toxic substances.

34.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva Inc. and another entity (Dow, Inc.) changed its name to DuPont de Nemours, Inc and became known as DuPont (New DuPont). New DuPont retained assets in the specialty products business following the spin-off and the balance of the financial assets and liabilities of E.I DuPont not previously assumed by Corteva, Inc. For the purposes of this complaint, references to "DuPont" will refer to Defendants E.I. duPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc and DuPont de Nemours collectively.

35.     The AFFF manufactured, distributed, and sold by these Defendants contained fluorosurfactant manufactured and sold by DuPont.

36.    The Defendant BASF Corporation ("BASF") is a corporation organized under the laws of Delaware, with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932 and does business throughout the United States including conducting business in Florida.

37.    Upon information and belief, BASF acquired Ciba, Inc (f/k/a/ Ciba Specialty Chemicals Corporation) in or about 2008 and became its successor in interest. BASF created, designed, manufactured, distributed and/or sold AFFF products containing PFOS, PFOA and/or their chemical precursors for use in producing fluorosurfactant used in AFFF products. The component products manufactured by BASF were used by other Defendants, including National Foam in their production of AFFF products. The City of Stuart Fire Rescue used National Foam's AFFF as well as from other Defendants.

38.    The Defendant Clariant Corporation ("Clariant") is a corporation organized under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina, 28205, and does business throughout the United States including conducting business in Florida.

39.    Upon information and belief, Clariant was formed in 1995 as a reformation of the specialty chemicals division of Sandoz Corporation ("Sandoz") and is the successor in interest to Sandoz. AFFF products, including fluorosurfactant for Dynax, containing PFOS, PFOA, and/or their chemical precursors were contained in the PFCs Clariant created, designed, produced, manufactured, distributed and/or sold.

40.    3M Company, Tyco Fire Products L/P.; Chemguard, Inc.,; Buckeye Fire Equipment Company; National Foam, Inc., Kidde-Fenwal, Inc., Dynax, Inc., E.I. DuPont de Nemours and Company; The Chemours Company, The Chemours Company FC; Corteva, Inc.,' DuPont de Nemours, Inc.; BASF Corporation; and Clariant Corporation are collectively referred to as "Corporate Defendants".

41.    All Corporate Defendants, at all times material hereto, acted by and through their respective agents, servants, officers and employees, who were acting within the course and scope of their actual or apparent authority, agency, and duties. The plaintiff claims that all Defendants are vicariously liable based on such activities.

8

42.    The Corporate Defendants provided, sold, manufactured, and/or distributed all or substantially all of the AFFF products within the vicinity of the water sources for Plaintiff's drinking water. Accordingly, concert of action, enterprise liability, and joint and several liability apply to the damages suffered by the Plaintiff caused by the Corporate Defendants.

43.    Plaintiff endeavored to identify the Corporate Defendants by the names associated with the products placed into the stream of commerce. Any references to a Corporate Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Corporate Defendants.

The Plaintiff shall prove that Corporate Defendants

a.  designed, manufactured, formulated, created, promoted, marketed, distributed, sold and/or otherwise (directly or indirectly) PFAS-containing AFFF and/or PFAS additives for use in AFFF which was released into areas affecting the City of Stuart and Martin County Utilities water supply, which in-turn affected Plaintiff's water supply, such that AFFF -related PFAS have contaminated Plaintiff's water supply;

b.  are responsible for the Plaintiff's exposure to the water supply poisoned by AFFF and/or PFAS additives for use in AFFF and delivered to the Plaintiff by the City of Stuart and Martin County Utilities, poisoned the Plaintiff and is the proximate cause of his illnesses, including cancer.

c.  acted with actual or constructive knowledge that PFAS-containing AFFF and/or PFAS additives for use in AFFF would be released into areas affecting the City of Stuart water system and Martin County Utilities and ultimately Plaintiff's water supply.

d.  are legally liable for committing each of the multiple tortious and wrongful acts alleged in this Complaint.

9

44.    Defendant, Martin County Utilities, is a division of Martin County, Florida, a governmental agency that performs regular water quality testing to ensure the safety and quality of the water delivered to its customers, including the sources from which Plaintiff consumed the hazardous cancer-causing drinking water.

45.    Martin County Utilities had a duty and an obligation to continuously test for various contaminants including but not limited to, PFAS and PFOS, and to submit or report to the City of Stuart the results of the testing, and to take immediate action regarding the safety of the citizens to whom the Martin County Utilities distributes "safe" drinking water to for bathing and consumption.

## JURISDICTION AND VENUE

46.    This is an action for damages in excess of Fifty Thousand Dollars ($50,000), exclusive of fees, costs and interest.

47.    The tortious conduct that is the subject matter of this complaint occurred in Martin County, Florida, and therefore venue is proper in this Court and the Court has jurisdiction over the parties.

## GENERAL FACTUAL ALLEGATIONS

### The Chemistry

48.    Products that are water repellant, stain resistant, heat resistant, oil repellant and fire retardant typically use PFAS compounds. PFAS compounds (polyfluroalkyl and perfluroalkyl substances) are organic fluorinated alkanes.

49.    PFAS compounds have two categories (1) perfluoraoalkyl acids (PFCA's) such as PFOA and (2) perfluoroalkane sulfonates (PFSA's) including perfluorohexane sulfonate (PFHxS) and PFOS. PFOS and PFOA compounds are the most toxic chemicals in the PFAS family. The Plaintiff's injuries are caused by elevated levels of PFOA and PFOS in his bloodstream as a result of drinking water supplied by Defendant Martin County Utilities that had been poisoned by the Corporate Defendants.

50.     There are unique characteristics of PFOS and PFOA that cause environmental contamination and contamination of the water supply. These characteristics include: (1) mobility - by design, the products that use PFAS chemicals are not absorbed into or broken down by soil or other substances, and instead, persist in the soil and are transported to the groundwater below. (2) persistence – these products are not bio-degradable or chemically degradable. The use of products containing PFOS and/or PFOA results in those compounds being introduced into the environment. They do not degrade. They do not weaken. They do percolate through the ground, to the subsurface and into groundwater, where they poison the water with carcinogenic substances that cause illness and injury to persons who drink the contaminated water, including the Plaintiff herein.

51.     The reasons that PFOS and PFOA are so dangerous and cause extensive environmental damage relates to the carbon-fluorine (C-F) chemical bond, considered to be one of the strongest that exist. That bond causes the PFOS and POFOA to accumulate in the environment and more importantly, accumulate in the human body. Bioaccumulation relates to the length of the C-F chain in the compound and the longer the chain the more bio-accumulative the substance becomes.

52.     The public health and welfare, as well as the health and welfare of individuals, such as the Plaintiff, is significantly harmed by PFOA and PFOS contamination of groundwater and the drinking water supplies. PFOA is easily absorbed into the body through drinking water and accumulates in the blood stream and the kidneys, liver and reproductive system.

53.     Research has shown that exposure to PFOS and PFOA laden fluorochemicals may cause testicular cancer, kidney cancer and liver damage. Developmental injuries and defects to unborn fetuses, breast-fed infants, and has been associated with skeletal anomalies, accelerated puberty and other medical issues. These injuries usually arise within months or a few years of exposure. The Plaintiff herein has been diagnosed with stage 4 cancer, as a direct and proximate result of drinking PFOS and PFOA-contaminated water.

54.     In May 2016, the U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria published a Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA) and found there is suggestive evidence of carcinogenic potential of PFOS and PFOA in humans.

**Corporate Defendants Produced PFOA/PFOS**

55.     The origin of the technology dates to the 1940s when 3M began a process called electrochemical fluorination (ECF) and created, contained, or resulted in compounds containing PFOA and/or PFOS.

56.     In the 1960s 3M created AFFF as a method to extinguish fires fueled by flammable liquids that cannot be controlled with water. An AFFF is produced synthetically by the combination of highly fluorinated surfactants with fluorine-free hydrocarbon foaming agents. Combined with water, this product forms an aqueous film that when spread across a hydrocarbon fueled fire, suffocates and extinguishes that fire.

57.     3M manufactured the raw materials for the production of AFFF and its own AFFF products from the 1960s into this century. National Foam and Tyco/Ansul began to manufacture, market and sell AFFF in the 1970s. Angus Fire and Chemguard began to manufacture, market and sell AFFF in the 1990s.

58.     Dynax began to manufacture, market and sell the raw materials for production of AFFF in the 1990s. Buckeye began to manufacture, market, and sell AFFF in the 2000s.

59.     By the 1960s, The Department of Defense and the US Navy began to use AFFF to extinguish fuel-based fires and it was used at hundreds of military bases.

60.     One of the most popular uses for PFOA resulted when DuPont purchased PFOA from 3M to produce the non-stick cooking wear product known as "Teflon" as early as 1951.

61.     Eventually, in 2000, 3M decided to find substitutes for PFOS and would phase out production of PFOS.

12

62.    In 2001 the Fire Fighting Foam Coalition was formed with founding member DuPont. Dupont used the FFFC to market fluorosurfactants to other AFFF manufacturers.

63.    On May 16, 2000, 3M publicly stated that the reason it ceased production of PFOS and PFOA products was in conformity with the company's principles of responsible environmental management. On that day, the EPA announced that 3M provided data that indicated these chemicals could potentially pose a risk to human health and the environment because they are very persistent in the environment and have a strong tendency to accumulate in human and animal tissues. PFOS combines persistence, bioaccumulation, and toxicity to an extraordinary degree.

64.    After 3M exited the AFFF market, the other Corporate Defendants continued to manufacture and sell AFF. The Defendants also know or should have known that there existed a large stockpile of AFFF products in the marketplace and with their customers and considered the long shelf life of these dangerous products a feature and not a bug.

65.    Even as the Corporate Defendants phased out production of AFFF, they did not recall the products from the stream of commerce nor warn the customers and users of AFFF that it contained highly toxic PFOS, PFOA, PFNA and/or PFHxS, and/or their chemical compounds.

66.    The result was that over the decades since the initial creation and production and use of AFFF, these AFFF products were contaminating the public drinking water in Martin County by being used by emergency services, and seeping into the ground, flowing into drainage systems, washing into the sediment, soils, and aquafer and endangering public health.

67.    The Corporate defendants did not instruct users, consumers, public officials, or those charged with protecting the public from their inherently dangerous products how to guard against the dangers of consuming tainted drinking water, or how to dispose of the stockpiles of AFFF.

## 3M Knew PFAS posed a Danger to Human Health

68.     From nearly the start, since the 1950's, 3M knew from its own research that PFAS were "toxic" to human health. 3M knew that PFAS would not biodegrade, would persist in the environment and would bioaccumulate in animals as well as humans.

69.     By the early 1960's 3M knew that landfills containing chemical waste containing PFAS posed a danger of PFAS leaching and seeping into the soil and entering the groundwater, invading the water table, and contaminating local or domestic well water. 3M knew that once PFAS entered the environment, it would remain stable and not degrade, retaining its toxicity.

70.     In the 1970's, knowing the dangers of exposure to PFAS, 3M conducted its own internal monitoring of employees exposed to PFAS by testing their blood. These tests revealed that PFAS would bioaccumulate in humans. By that time, 3M concluded that PFOA was present in blood samples of other Americans throughout the country.

71.     PFAS and PFOA are not naturally occurring substances in nature. They are man-made products that result from or are produced by a manufacturing process created by 3M. The fact that PFOA was a universal presence in the blood serum of American's alerted 3M to the fact that PFOA is persistent, bio-accumulative, mobile, and not biodegradable. 3M's own studies proved that PFOA and PFOS are toxic to other primates.

72.     3M's ignored its own reports in 1979 requesting a risk assessment for PFOS and other similar substances. Internal concerns were noted by 3M scientists through the end of the century.    A 1984 internal analysis by 3M revealed that PFAS was bioaccumulating in their own 3M fluorochemical engineering employees.

73.     3M's business decision to ignore the known dangers of exposure to PFAS to its employees and the public resulted in one employee resigning in 1999 citing his refusal to continue to participate in the process of managing PFAS and stated, "it is unethical to be concerned with markets, legal defensibility and image over environmental safety". Finally, after increased public pressure and scrutiny by the EPA, 3M agreed to phase out continued production of PFOS and PFOA in 2000.

74.     Despite knowing it to be false, 3M issued a news release on May 16, 2000, claiming that their products are safe, but nonetheless agreed to phase out production. The 3M press release announcing the "phase out" admitted that their own research proved the chemical to be very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term".

75.     3M did not remove its existing stockpile of PFAs containing products from its inventory and continued to sell and market these inherently and known to be dangerous products.

76.     3M did not recall the existing inventory of dangerous products from the stream of commerce, its distributors, wholesalers, warehouses, or customers. Indeed, citing the stability and long shelf life of these products, they remained in the stream of commerce long after the phase out of new production of these toxic chemicals.

77.     3M knew, or should have known, that the use of their products containing PFAS would and did contaminate the water supply creating a public health hazard, injuring people and the environment.

78.     3M, despite and contrary to its own studies, research and investigations, and despite the conclusive evidence to the contrary, continued to promote the use of PFOS and PFOA, and deny the harm to the public.

### DUPONT'S Knowledge of the Dangers of PFAS

79.     DuPont treated PFOA toxicity in a similar manner as 3M. They internally recognized and warned that their PFOA products should not come into contact with the skin and were toxic as early as 1961. 3M provided information to DuPont in 1978 that reported elevated levels of fluorine in the blood of workers exposed to PFOA.

80.     DuPont began to monitor the blood of workers exposed to PFOA in 1979 and discovered increased health issues in those workers who were exposed than those who were not exposed to PFOA. DuPont ignored its moral obligation and duty to its employees

and its civic duty to the general public and ultimately the Plaintiff herein, by choosing to bury the results of those incriminating blood test results.

81.    In 1980, DuPont confirmed the toxicity of PFOA and advised against continued exposure. DuPont's knowledge of the dangers of human exposure included being aware that PFOA would accumulate in human tissue and was capable of being transported from the maternal blood in the placenta to the fetus in her womb.

82.    In addition to the dangers to animals and humans, by 1984 DuPont also became aware that PFAS contaminated the surrounding environment, is bio-persistent and would leach into groundwater eventually used by the public for drinking.

83.    In 1984, after becoming aware of PFOA releases and resulting contamination near DuPont's West Virginia facility, DuPont's corporate directors and decision makers chose to ignore known available methods of reducing and/or controlling PFOA releases from the facility. They also chose to ignore available alternative technology or materials in the face of the evidence of the toxicity of their products. DuPont considered the issue to be about corporate image. DuPont endeavored to treat the matter as a public relations matter and efforts to reduce or eliminate their toxic product from the marketplace and stream of commerce were considered and rejected as closing the barn door after the cow was gone as far as liability for claims.

84.    Knowing that any ethical and moral legal department as well as any medical department worthy of respect would insist on the total elimination of PFOA in DuPont's products, the business decision was made to continue promoting the use of PFOA.

85. In 2006, DuPont's own Epidemiology Review Board objected to DuPont's public statements denying the adverse health effects on humans from exposure to PFOA. Clearly, DuPont knew from its own sources that their products containing PFAS were dangerous to the public health, knew how they contaminated public drinking water supplies, and knew of alternative methods or products, and yet chose profits over people and intentionally deceived, misled, and lied to the public about the dangers from the intended and common uses of their products.

16

**Other Defendants Knowledge of PFAS**

86.     The other Corporate Defendants (Tyco/Ansul, Chemguard, Buckeye, Kidde/Kidde Fire, Dynax, National Foam/Angus Fire, BASF and Clariant Corporation) knew or should have known that their AFFF products and/or other products containing PFAS were dangerous and known to be harmful to humans, animals, the environment and the public water supply.

87.     The Corporate Defendants named herein are not mere innocent end users of these toxic products. They created, manufactured, composed and produced the products containing these chemical compounds and are experts in the field of manufacturing AFFF. They have knowledge of the intended uses of their products and knew or should have known that, used as directed and intended by these Corporate Defendant manufactures, the product would leach into the soil, eventually but predictably contaminating the ground water and would poison anyone drinking that tainted water supply.

88.     Instead of taking these harmful products out of the marketplace and stream of commerce, these Corporate Defendants (with the exception of 3M) doubled down on their callousness and greed and formed an AFFF trade group (the Firefighting Foam Coalition – "FFFC") in 2001 to promote the usage of AFFF. This occurred after and despite 3M deciding to phase out the production of AFFF when confronted with the evidence of the inherent danger of exposure to PFAS through contact or ingestion.

89.     The FFFC is a coalition of "industry leaders formed to represent manufacturers, distributors, and users on issues related to the efficacy and environmental impact of firefighting foams."

90.     The FFFC is both a sword and a shield for the Corporate Defendants. It is a sword used to publish and promote the use of AFFF products and a shield against regulations and health and environmental concerns.

91.     FFFC, as a voice of the Corporate Defendants, misled the public by touting the removal of the single compound PFOS from the market as the remedy to the contamination to the environment and injuries to the public caused by the entire family of PFAS toxins.

**DuPont creates Chemours to Shield it from Liability**

92.     In 2005, DuPont settled with the EPA and agreed to the largest penalty in history to that point of $10.25 million dollars for alleged violations of the Toxic Substances Act ("TSCA") and the Resource Conservation and Recovery Act ("RCRA").

93.     In 2005, Dupont paid $343 million dollars to settle a class action lawsuit involving residents of Ohio and West Virginia. DuPont also agreed to fund research that eventually proved PFOA's link to cancer.

94.     In February 2014 The Chemours Company was formed as a wholly owned subsidiary of Dupont. At that time, Dupont's "performance chemicals" business consisted of Titanium Technologies, Chemical Solutions and Fluorochemicals divisions. These divisions were transferred to The Chemours Company by July 2015. DuPont had agreed to phase out production and use of PFOA by 2015.

95.     Chemours also assumed liability for DuPont's former manufacture, use and disposal of PFAS. In addition, Chemours agreed to indemnify DuPont against Chemours liabilities specifically arising out of or resulting from the Performance Chemicals divisions, at any time.

96.     As a result of this spin off of assets, and more relevantly, the liabilities associated with DuPont's former "Performance Chemicals" division, Chemours agreed to indemnify and assume DuPont's liability and exposure for liabilities that arose at any time in the past or future from claims of negligence, gross negligence, recklessness, violations of law, fraud, or misrepresentation by any member of the Dupont or Chemours group. This included any environmental liabilities primarily associated with the Performance Chemicals Divisions. The agreement even went as far as requiring Chemours to attempt to be fully substituted for Dupont in any court action, judgment or agreement regarding environmental liabilities.

97.     The result of the creation of Chemours was to corral a large segment of Dupont's environmental liability exposure, including those related to PFAS, its chemicals

18

and products, and place those liabilities onto a separate entity. DuPont executed a reverse fraudulent transfer by transferring liabilities (as opposed to assets) to a new entity to avoid the claims of creditors.

98.     Nonetheless, the Plaintiff consumed water that had been contaminated by the Corporate Defendants' production and distribution of AFFF and other products containing PFAS and as a direct and proximate result, became ill and suffers from stage 4 cancer and has been given only months to live by his medical team.

**The Contamination of the Martin County Water Supply**

99.     Martin County Utilities operates the City of Stuart water system. Stuart used to boast about having the highest quality, safest and best tasting water. Martin County Utilities draws water for its Stuart customers from the Surficial Aquifer through 30 groundwater wells.

100.    Water drawn from the Surficial Aquifer through the groundwater wells is then treated at a central water treatment facility. After being treated, the water is then pumped through a series of distribution main lines into service lines for approximately 4500 commercial and residential connections. The Plaintiff consumed water provided by the Martin County Utilities.

101.    Stuart Fire Rescue purchased Corporate Defendants AFFF. Stuart Fire Rescue provided education and training to its emergency personnel which included the use of AFFF. Stuart Fire Rescue routinely practiced firefighting techniques and training using AFFF.

102.    Over the decades, these training sessions were usually conducted on the open fields behind Stuart Fire Rescue Headquarters at 800 SE MLK Jr. Blvd., Stuart, FL 34994. During and after these training sessions, AFFF would be allowed to seep into the surface soil and, because it does not degrade, eventually and predictably infiltrate the Surficial Aquifer from which Martin County Utilities draws water for consumption by its customers and the public including the Plaintiff.

103.    Upon information and belief, the City of Stuart Fire Department uses other properties in the city and county and more importantly, in the areas from which the City of Stuart and Martin County Utilities draws groundwater for use in the public water system, for training and other purposes and uses, spills, discharges and otherwise contaminates the groundwater with AFFF and its toxic components as described herein.

104.    Martin County Utilities was aware and had actual knowledge that the water supply was contaminated with dangerous levels of PFAS and PFOS as early as 2016.

105.    Beginning in 2012, the Environmental Protection Agency (EPA) included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule (UCMR3) which required the City of Stuart to test their water supply for the presence of PFOS and PFOA.

106.    In May 2016 the City of Stuart and Martin County Utilities became aware that the water supplied to the Plaintiff was contaminated with PFOS and PFOA. The Florida Department of Environmental Protection reported the results of the UCMR3 monitoring. The test results found that the water at the City's point of entry of the water distribution system contained 70 parts per trillion of PFOS and PFOA. At that time, the EPA had determined that it was unsafe for the water supply to have more than 4 parts per trillion of these toxic chemicals.

107.    The Florida Administrative Code, Section 62-560.440(2) (Public Notification for Unregulated Contaminants) (effective date 8/5/2016) provides that the supplier of water shall notify persons served of the availability of the sampling results by including a notice in the first set of water bills issued by the system after receipt of the results or by written notice within three months of the receipt of the results.

108.    Martin County Utilities routinely included test results with its monthly billing statements but excluded the results that reported the toxic level of PFAS and PFOS contamination.

109.    After further testing, Martin County Utilities learned that several of its wells, especially those in the vicinity of the City of Stuart Fire Rescue Station, had high levels of PFOS and PFOA. Soon thereafter, the City of Stuart and Martin County Utilities learned that nearly all of its wells had unsafe levels of PFOS and PFOA.

20

110.    Although those contaminated wells were taken offline by Martin County Utilities, Martin County Utilities either failed to issue a completed DEP Form 62-555.900(22), Certification of Delivery of Public Notice which must include the type of notice distributed, published, posted, and made available to the persons served by the system and the media, or failed to issue the notice so required.

111.    As a result, people, including the Plaintiff herein, who relied upon the public water system operated by Martin County Utilities were not warned about the extremely toxic levels of PFOA and PFOS in their water supply, as required by Florida law.

## Enterprise Liability, Market Share Liability and Concert of Action Among Defendants

112.    Due to its nature, it is not possible to specify the exact Defendant who manufactured any specific AFFF or component product containing PFOA, PFOS and the other chemical precursors that has contaminated a specific water supply.  At all times relevant herein, these Corporate Defendants controlled a substantial market share for AFFF and AFFF Component containing products.

113.    The Corporate Defendants are manufacturers of the AFFF and AFFF Component products that have contaminated the groundwater and are jointly responsible for damages caused as a result. Liability should be imposed according to the percentage of the market share that each of these Defendants controlled.

114.    These Corporate Defendants entered into a settlement agreement with the City of Stuart resulting in payments to the City of Stuart for damages and to restore the City of Stuart's water supply to safe standards, free from the contamination caused by these Defendants.

115.    These Corporate Defendants acted in concert, formed a trade association to promote their joint interests, increase sales and market share, and implemented a common plan to manufacture, market, and sell products that they knew were inherently dangerous,

specifically, AFFF and AFFF Component products containing PFOS, PFOA and their chemical precursors and components.

116.    Accordingly, Enterprise Liability, Concert of Action and Market Share liability should be imposed on these Corporate Defendants.

## COUNT 1

## NEGLIGENT FAILURE TO WARN AGAINST ALL DEFENDANTS

117.    Plaintiff realleged and reavers the allegations of paragraphs 1-116 as if fully set out herein.

118.    The Defendants manufactured, produced, and placed into the stream of commerce AFFF and AFFF-related component products that were unreasonably dangerous for their anticipated and intended uses.

119.    Defendants fail to use reasonable care in the manufacturing, marketing, selling, distribution, and supply of AFFF and AFFF-related components. Reasonable care on the part of the Defendants requires that the Defendants give appropriate warnings about particular risks of their products that the Defendants knew or should have known are involved in the reasonably foreseeable use of their products.

120.    At all times material to the Plaintiff's ingestion of water contaminated with cancer-causing AFFF and AFFF-related toxic chemicals, all Defendants knew or should have known, that a reasonably careful, designer, manufacturer, seller, distributor, and supplier of drinking water would have given appropriate warnings about the particular risks of AFFF and AFFF-related products.

121.    The Defendants failed to provide or give any warning to the public or to the Plaintiff herein, that drinking water was contaminated with AFFF and AFFF-related products and can cause serious illnesses, including cancer.

122.    As set out in more detail above, the Corporate Defendants knew or should have known, that the intended use of AFFF and AFFF-related products would result in the

toxic chemicals leaching and infiltrating the local water tables and would contaminate the groundwater used for drinking water.

123.    The Defendants failed to use reasonable care when they failed to give appropriate warning about the risks of consuming drinking water contaminated by their products which they knew or should have known would result from the use and consumption of the water supply contaminated by the Corporate Defendant's products and delivered to the Plaintiff by Martin County Utilities.

124.    As a direct and proximate consequence of the failure to warn Plaintiff about the risks and dangers of drinking water contaminated by the Corporate Defendants and delivered by Martin County Utilities, Plaintiff ingested copious amounts of drinking water, became ill, was diagnosed with cancer, has undergone treatment and, despite that, has been advised that he has only a few more months to live.

**WHEREFORE**, Plaintiff demands judgment against the Defendants for the negligent failure to warn the Plaintiff of the risks associated with consuming the water and seeks compensatory damages, interest and costs, and for any and all other relief as is just under the premises.

## COUNT 2
## STRICT LIABILITY FOR DESIGN DEFECTS AGAINST CORPORATE DEFENDANTS

125.    Plaintiff realleged and reavers the allegations of paragraphs 1-116 as if fully set out herein.

126.    The Corporate Defendants designed, created, composed, manufactured, produced, and ultimately distributed products that were and are unreasonably dangerous to the native ground waters drawn upon by the City of Stuart and Martin County Utilities and supplied to the general public including the Plaintiff.

127.    Due to the chemical structure of AFFF and AFFF-related component products, as more fully discussed above, Defendants' dangerous product contaminated the

water supply without substantial change in its structure or reduction of the danger to the public.

128.   The Defendants' AFFF and AFFF-related products are unreasonably dangerous because of their design and are inherently unsafe when used for their intended purposes.

129.   Since AFFF and AFFF-related products were no longer provided by the Corporate Defendants, alternative safer products have been designed and produced. These safer and non-toxic alternatives have been available since approximately the year 2000.

130.   Upon information and belief, the Corporate Defendants knew of or had created alternative safer products that do not contain PFAS or PFOA and are safer for the user and the environment, including the water supply and groundwater., but nonetheless, continued to market and sell and profit from the sale of AFFF and AFFF-related dangerous products.

131.   The Corporate Defendants knew or should have known that the foreseeable consequences of contaminated groundwater causing disease and death to consumers of that contaminated water outweighed any benefits from the use of these dangerous products to train firefighters and use them in suppressing fires.

132.   As a direct and proximate result of the defective design of these 'Forever chemicals" and the foreseeable contamination of the public water supply, Plaintiff has suffered physical injury, including but not limited to stage 4 cancer, has undergone treatment and continues to undergo treatment and has been advised that he has only a few months to live.

**WHEREFORE**, Plaintiff demands judgment against the Corporate Defendants for strict liability for the defective design of their products and claims compensatory damages, interest and costs, and for any and all other relief as is just under the premises.

24

## COUNT 3

## NEGLIGENCE AGAINST ALL DEFENDANTS

133.     Plaintiff realleged and reavers the allegations of paragraphs 1-116 as if fully set out herein.

134.     Defendants, as corporate entities authorized to exist by the laws of the various states, have a duty to not create, design, manufacture, sell, distribute, promote or encourage the use of products that they knew, or should have known, were dangerous to its users, to those that came in contact with the product and more relevant to this matter, would contaminate the groundwater consumed by millions of people around the world, and specifically, the Plaintiff here in Martin County Florida.

135.     As detailed above, the Defendants knew that the products that contained AFFF and AFFF-related compounds were inherently dangerous when used for their intended purposes and posed dangers to consumers such as the Plaintiff who, as a foreseeable result of consuming drinking water contaminated by the Corporate Defendants and supplied by Martin Couty Utilities, became ill, and suffered physical injury.

136.     The Defendants breached their duty to the general public and to Plaintiff by creating designing, manufacturing, selling, distributing, promoting, and encouraging the uses of their dangerous products.

137.     The Defendant's negligent breach of their duty is the direct and proximate cause of Plaintiff's physical injuries because there is a direct medical link between the consumption of the drinking water contaminated by the Corporate Defendants and the physical injury and disease suffered by Plaintiff.

138.     As a direct and proximate result of the negligent contamination of the groundwater with these 'Forever chemicals" and the foreseeable contamination of the public water supply, Plaintiff has suffered physical injury, including but not limited to stage 4 cancer, has undergone treatment and continues to undergo treatment and has been advised that he has only a few months to live.

**WHEREFORE**, Plaintiff demands judgment against all Defendants for negligence and seeks to recover compensatory damages, interest and costs, and for any and all other relief as is just under the premises.

## JURY DEMAND

The plaintiff demands trial by struck jury on all Counts of his Complaint.

DATED this 13th day of September 2024.

Respectfully submitted,

**THE LAW OFFICES OF TRAVIS R. WALKER, P.A.**

By: /s/ *Travis R. Walker, Esq.*

Travis R. Walker, Esq.
Attorneys for Plaintiff
Florida Bar No. 36693
1100 SE Federal Highway
Stuart, Florida 34994
Telephone: (772) 708-0952
Jeffrey.Thomas@traviswalkerlaw.com
Service@traviswalkerlaw.com
Jim.Oster@traviswalkerlaw.com